CV-06 5026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

FILED
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★   SEP 15 2006   ★

----------------------------------------------------------x   (S.I.)

BERT VLADIMIR and IRVING ROSENZWEIG, :
derivatively on behalf of Nominal Defendant
Computer Associates Corporation,

        Plaintiffs,

    -against-

SANJAY KUMAR, RUSSELL ARTZT,
CHARLES B. WANG, ALFONSE M. D'AMATO, :
GARY FERNANDES, ROBERT E. LA BLANC,
LEWIS S. RANIERI, JAY W. LORSCH,
WALTER P. SCHUETZE, WILLEM deVOGEL,
KENNETH D. CRON, WILLIAM E.
MCCRACKEN, JOHN A. SWAINSON, LAURA :
S. UNGER, RON ZAMBONINI, ROEL PIEPER,
RICHARD GRASSO, IRVING GOLDSTEIN and
CHRISTOPHER B. LOFGREN,

        Defendants,

    -and-

CA, INC.,

        Nominal Defendant.

----------------------------------------------------------x

LONG ISLAND OFFICE

CIVIL ACTION NO.: PLATT, J.
BOYLE, M.

VERIFIED SHAREHOLDERS'
DERIVATIVE COMPLAINT

    Plaintiffs Bert Vladimir and Irving Rosenzweig suing derivatively on behalf of, and for

the benefit of, CA, Inc. (hereinafter "CA" or the "Company"), allege as follows upon information

and belief, except as to paragraph 5 which is alleged upon knowledge:

## JURISDICTION AND VENUE

    1.  This Court has jurisdiction over the subject matter of this action pursuant to Section

27 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78aa, and 28

U.S.C. § 1331, as well as supplemental jurisdiction over plaintiffs' claims pursuant to 28 U.S.C. § 1367(a).

2.   The claims asserted herein arise under Section 14 of the Exchange Act, 15 U.S.C. § 78n and the rules promulgated thereunder by the Securities and Exchange Commission (the "SEC"), 17 C.F.R. 240.14, et seq. and common law.

3.   Venue is proper in this District pursuant to Section 27 of the Exchange Act and 28 U.S.C. § 1391(b) and (c).  CA is has its principal place of business in this District.

4.   In connection with the acts, conduct and other wrongs alleged herein, defendants, directly and indirectly, used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

## PARTIES

5.   Plaintiffs are the beneficial owners of shares of CA, Inc. ("CA") common stock and have beneficially owned CA shares at all times relevant to this action.  Plaintiffs are citizens of New York.  Plaintiffs bring this action derivatively in the right of and for the benefit of Computer Associates seeking damages caused to CA by the CA directors named as defendants.

6.   Nominal defendant CA is a corporation duly organized and existing under the laws of the State of Delaware with its principal executive offices located at One Computer Associates Plaza, Islandia, New York 11749.  The Company designs, markets and licenses computer software products that allow businesses to run and manage critical aspects of their information technology operations and that allow data center managers and programmers to automate their daily functions.

2

7.   Defendant Sanjay Kumar ("Kumar") was a director and officer of CA at all relevant times until June 2004. Defendant Kumar joined CA in 1987 and became CA's president and Chief Financial Officer in 1994, Chief Executive Officer in 2000 and Chairman in 2002 when he succeeded CA founder defendant Charles Wang in that position.

8.   Defendant Charles B. Wang was a director and officer of CA during most of the period when the stock options which are the subject of this complaint were granted.

9.   Defendant Russell Artzt ("Artzt") was a director of CA during the period when the stock options were granted

10.   Defendant Alfonse M. D'Amato ("D'Amato") has been a director of CA since 1999 and a member of CA's Stock Option and Compensation Committee ("SOCC"). He has been the Managing Director of Park Strategies LLC, a business consulting firm, since January 1999 when he retired from the U.S. Senate. Mr. D'Amato has received extremely profitable CA consulting engagements from defendants Wang and Kumar since leaving the U.S. Senate.

11. Defendant Gary Fernandes ("Fernandes") has been a director of CA since May 2003 and a member of the committee which was the successor to the SOCC, i.e., the Compensation and Human Resource Committee ("CHRC").

12. Defendant Robert E. La Blanc ("La Blanc") has been director of CA since May 2002 and a member of the CHRC. He is the Founder and President of Robert E. La Blanc Associates, Inc., an information technologies consulting and investment banking firm, since 1981 and a member of the SOCC.

13. Defendant Lewis S. Ranieri ("Ranieri") has been a director of CA since May 2001 and a member of the CHRC.

3

14. Defendant Jay W. Lorsch ("Lorsch") has been director of CA since May 2002 and a member of the CHRC.

15. Defendant Walter P. Schuetze ("Schuetze") has been director of CA since May 2002.

16. Defendant Willem deVogel ("de Vogel") and was a director of CA and a member of the SOCC.

17. Defendant Kenneth D. Cron ("Cron") was Interim CEO of the Company from April 2004 to February 2005. He has been a director of CA since 2002 and a member of the CHRC.

18. Defendant William E. McCracken ("McCracken") has been a director of CA since 2005 and a member of the CHRC.

19. Defendant John A. Swainson ("Swainson") has been a director of CA since 2004. He is currently the Company's CEO and President.

20. Defendant Laura S. Unger ("Unger") has been a director of CA since 2004.

21. Defendant Ron Zambonini ("Zambonini") has been a director of CA since 2005.

22. Defendant Roel Pieper ("Pieper") served as a director CA from 1999 until August 2002. He was a member of the SOCC during his tenure on the CA Board.

23. Defendant Richard Grasso ("Grasso") was a director of CA from 1994 to 2002 and a member of the SOCC.

24. Defendant Irving Goldstein ("Goldstein") was a director CA from 1990 to 2000 as well as a member of the SOCC and CA's Audit Committee.

25. Defendant Christopher B. Lofgren ("Lofgren") has been a director of CA since November 11, 2005.

4

26. Defendants D'Amato, Ranieri, deVogel, Pieper, Grasso, Goldstein, LeBlanc, Cron,

Fernandes, Lorsch and McCracken are sometimes hereafter referred to as the "SOCC

Defendants."

## FACTUAL ALLEGATIONS

### A. The SOCC Failed To Administer Stock Option Plans In Accordance With The Plans' Terms And Conditions As Approved By Stockholders' Votes At Annual Meetings In 1981, 1987, 1991 And 1993

27. Since at least its fiscal year 1996, CA has included in its compensation to executive

employees and non-executive employees awards of stock options. Industry practice, accounting

principles and good compensation practices dictate that the terms of such options be set at the

time the options are granted under the applicable compensation plan and that the options be

awarded to specific employees at, or very close to, the time of the grant of the options.

28. From CA's fiscal year 1996 (beginning July 1, 1995) through its fiscal year ended

June 30, 2001, the SOCC has been responsible for prescribing, amending, rescinding, and

interpreting rules relating to CA's various compensation and incentive plans. Among the plans

were the Company's 1981 Incentive Stock Option Plan, 1987 Non-Statutory Stock Option Plan,

the 1991 Plan and the 1993 Plan (sometimes collectively referred to hereafter as the "Plans").

29. The Plans were administered from fiscal year 1996 through fiscal year 2001 by the

SOCC, which, according to CA's proxy statements during the relevant fiscal years, determined

(i) the individuals to whom options were to be granted, (ii) the date or dates of grant, and (iii) the

number of shares covered by the options granted. According to the Plans, the per share exercise

price of options granted may not be less than 100% of the closing sales price of a CA share of

5

common stock on the date of grant.  Shares of Common Stock acquired may be treasury shares, including shares purchased in the open market, newly issued shares or a combination thereof.

30. From fiscal years 1996 through 2001, pursuant to the Plans (and accepted practices), the SOCC approved grants of stock options and set the exercise price, vesting schedule and other terms of the stock options at the time of the grant.  The grants of such stock options were approved by the SOCC as part of employees' compensation for a specific fiscal year.  The intent of the Plans was to award the stock options to the employees, according to the Plans, with a strike price at or near the market price at the time of the grant of the options.  The Plans were not designed or intended to allow CA to grant stock options at a time when the stock price was low there was no intent to award the stock options to specific employees at or about the time of the grant.

31. For fiscal year 1996 through fiscal year 2001, the Plans were administered by the following directors:

(a)  During fiscal year 1996, the SOCC members were de Vogel, Goldstein, and Grasso.  During fiscal year 1997 the SOCC met once and acted by unanimous written consent on one occasion.

(b)  During years in fiscal 1998 and 1999, the SOCC members were de Vogel, Goldstein, and Grasso.  During fiscal year 1998, the SOCC met twice and acted by unanimous written consent on two occasions in fiscal year 1999 the SOCC met six times.

(c)  During fiscal year 2000, the members of the SOCC were D'Amato, de Vogel, Grasso, and Pieper.  During fiscal year 2000, the SOCC met eight times and acted by unanimous written consent on two occasions.

6

(d) During fiscal year 2001, the SOCC members were D'Amato, de Vogel, Grasso, and Pieper. The SOCC met four times and acted by unanimous written consent on two occasions.

32.     During fiscal year 2002, the SOCC was renamed The Compensation and Human Resource Committee of the Board (the "CHRC"), and its members were Pieper, Grasso and Ranieri. The duties and responsibilities of the CHRC were the same as the SOCC with respect to Plan administration. During fiscal year 2002, the CHRC met three times and acted by unanimous written consent on three occasions.

33. During fiscal year 2003 the members of the CHRC were Ranieri, LaBlanc, Cron, Fernandes, Lorsch and Ranieri. During fiscal year 2003, the SOCC met three times and acted by unanimous written consent on four occasions.

34. During fiscal year 2004, the members of the CHRC were defendants Ranieri, Cron, Fernandes, LaBlanc and Lorsch.

35. During fiscal year 2005, the members of the CHRC were defendants Ranieri, Fernandes, Lorsch and McCracken.

36. From fiscal years 1996 through 2001, the SOCC granted options to purchase millions of shares pursuant to the Plans as follows:

(a) In fiscal year 1996, the SOCC granted to employees' options to purchase an aggregate of 4,140,000 (adjusted for the three-for-two stock split payable July 15, 1996) shares of the Company's Common Stock.

7

(b) In fiscal year 1997, CA employees were granted options to purchase an aggregate of 6,278,166 (adjusted for the three-for-two stock split effective June 19, 1996) shares of the Company's Common Stock.

(c) In fiscal years 1998, 1999, 2000 and 2001, CA granted options to purchase 8.9 million, 4.7 million, 7.1 million, 11.1 million, and 8 million CA common stock, respectively, under the Plans.

37. Contrary to the terms of the Plans which required that stock option grants be awarded to specific employees at the time of the grant at fair market value, during the period from fiscal year 1996 through fiscal year 2001, the SOCC granted options to purchase millions of shares into "pools" without a specific award to the employee who eventually received the option. In many cases the granted, but unawarded, options went unawarded for several years. However the unawarded options were an expense of CA in the year they were granted even though not awarded.

38. CA's proxy statements for the fiscal years 1996 to 2001, represented that the SOCC awarded the options to individual employees. Each of those Proxy Statements referred stockholders to the Company's financial statements in the Annual Reports which accompanied the Proxy Statement. Each of those financial statements materially misrepresented the number of options awarded and the compensation expense associated with the grant of those stock options and violated Section 14 (a) of the Securities Act of 1943 and Rule 14 (a)(9) promulgated thereunder.

39. Finally, on July 31, 2006, CA revealed the misuse and misappropriations of hundreds of millions of dollars of options when CA disclosed that the options granted in fiscal years 1996

8

to 2001 were not awarded to any specific individuals but remained in "pools". On July 31, 2006,

CA issued a press release entitled "CA Files Annual Report on Form 10-K for Fiscal Year 2006."

The press release disclosed that the Company had discovered that, prior to 2002, the

Compensation Committee of the Board of Directors has approved pools of options to, primarily,

non-executive employees. According to the Press Release the fact that these individuals had

received these grants was not communicated to the recipients until up to two years after the

approval of the options. Accordingly, the Company determined, the proper accounting treatment

for the options in the pool is to account for them as an expense using as the value measurement,

the price of the stock at the time of the award. The Form 8-K filed by the Company in July 31,

2006, disclosed that the Company had previously treated the date of approval of the options as

the accounting measurement date for determining stock-based compensation expense.

Furthermore, the press release disclosed that, in almost all cases, the exercise set at the approval

time was lower than the market price on the date the grant was communicated to the recipients.

The Form 10-K filed on July 31, 2006 stated, as follows:

> Based upon the results of our review, we determined that in years
> prior to fiscal year 2002, we did not communicate stock option
> grants to individual employees in a timely manner. In fiscal years
> 1996 through 2001, the Company had delays of up to
> approximately two years from the date that employee stock options
> were approved by the committee of the Company's Board of
> Directors charged with such duties (the "Committee"), to the date
> such stock option grants were communicated to individual
> employees.
>
> Prior to fiscal year 2002, the Committee generally approved grants
> to executives and other employees receiving options, the terms of
> which were generally set on the date that the Committee acted,
> including the exercise price, vesting schedule and term. However,
> in a number of cases, these approvals involved pools of options
> that were not allocated to specific individuals at the time of such

9

> approvals. It also appears that communication of these grants by management to individual employees was not made until some time after the Committee acted, including in some cases up to two years after such Committee action. In almost all cases, this earlier date had an exercise price that was lower than the market price of the Company's common stock on the date the award was formally communicated to employees. The grants which were not communicated on a timely basis were made primarily to non-executive employees and his grant practice was changed after fiscal year 2002. The current practice is that a grant is communicated promptly after it is approved by the Committee.
>
> The Company treated the date of the action by the Committee as the accounting measurement date for determining stock-based compensation expense. However, the Company had determined that he proper accounting measurement date for stock option awards that were not communicated timely to an employee, should have been the date the grant was communicated to an employee, not the date the Committee approved the grant.

40. The difference in prices means that CA awarded options to employees for more valuable than originally intended by the SOCC at the time of grant. As a direct result of the early grant and later award, CA has incurred hundreds of millions of dollars in incremental compensation expenses it would otherwise not have incurred. As a result, the Form 10-K for the fiscal year 2005, filed on July 31, 2006, reflected a restatement for fiscal years 1996 through 2006 to reflect the increase in CA's compensation expense in the amount of $342 million for fiscal years 1996 through 2006 as set forth below.

| Fiscal Year | | Additional Pre-Tax Expense (in millions) | | Additional After-Tax Expense (in millions) | |
|---|---|---|---|---|---|
| Years prior to fiscal year 2002 | $ | | 165 | $ | 78 |
| 2002 | | | 83 | | 50 |
| 2003 | | | 50 | | 30 |
| 2004 | | | 29 | | 16 |
| 2005 | | | 12 | | — |
| 2006 | | | 3 | | 1 |
| Total cost for all fiscal periods | $ | | 342 | $ | 175 |

10

**B.    The Defendants Who Have Been Board Members Since The Deferred Prosecution Agreement Was Signed Have Caused Damage and Injury To Ca Because They Failed To Ensure CA'S Compliance With The Deferred Prosecution Agreement Provisions**

41. In 2002, the United States Attorney's Office for the Eastern District of New York

(USAO) and the SEC began an investigation concerning certain of the Company's past

accounting practices, which eventually centered on the Company's revenue recognition policies.

During the course of these investigations, several CA executives were charged and pled guilty of

federal crimes including securities fraud and obstruction of justice.  Among those pleading guilty

were Stephen Woghin, CA's former general counsel, Sanjay Kumar, CA's former CEO and

Chairman, IRA Zar, CA's former CFO, Stephen Richards, CA's former Executive Vice President

of Sales, Lloyd Silverstein, David Kaplan and David Rivard, all of whom were executive officers

responsible for sales and accounting at CA.  In April 2004, CA determined that the Company

should restate certain financial data to reflect properly the timing of the recognition of license

revenue for the Company's fiscal years ended March 31, 2001 and 2000.  The restatement

involved over $2 billion of improperly recognized revenue.

42. On September 22, 2004, CA entered into a Deferred Prosecution Agreement (the

"DPA") with the USAO and consenting to the entry of a Final Consent Judgment in a parallel

proceeding brought by the SEC (the "Consent Judgment"), to resolve the charges being

investigated by the USAO and SEC.  At the time the DPA was entered into, defendants Artzt,

D'Amato, Fernandes, LeBlanc, Ranieri, Lorsch, Schuetze, Cron, Swainson and Unger were CA's

directors.  Thereafter defendants McCracken, Zambonini and Lofgren joined CA's Board.

11

During their respective tenures the aforementioned directors (hereinafter referred to as the "DPA Director Defendants") were responsible for CA's compliance with the DPA.

43. The DPA required CA, among other things, to take the following actions by December 31, 2005: (1) add a minimum of two new independent directors to its Board; (2) establish a Compliance Committee of the Board; (3) implement an enhanced compliance and ethics program, including appointment of a Chief Compliance Officer; (4) reorganize its Finance and Internal Audit Departments; and (5) establish an executive disclosure committee. However the reorganization of the Internal Audit Department was not completed in accordance with the DPA.

44. The Company was also required to agree to the appointment of an Independent Examiner to examine the Company's practices for the recognition of software license revenue, its ethics and compliance policies and other matters. Under the Agreements, the Independent Examiner also reviews the Company's compliance with the Agreements and periodically reports findings and recommendations to the USAO, SEC and Board of Directors. On March 16, 2005, the Federal Court appointed Lee S. Richards III, Esq. of Richards Spears Kibbe & Orbe LLP, to serve as Independent Examiner. Mr. Richards will serve for a term of 18 months unless his term of appointment is extended under conditions specified in the DPA. Pursuant to the DPA, the USAO will defer and subsequently dismiss prosecution of a two-count information filed against the Company charging it with committing securities fraud and obstruction of justice if the Company abides by the terms of the DPA, which currently is set to expire within 30 days after the Independent Examiner's term of engagement is completed.

12

45. On September 15, 2005, Mr. Richards issued his six-month report concerning his recommendations regarding best practices. On December 15, 2005, March 15, 2006 and June 15, 2006, Mr. Richards issued his first three quarterly reports concerning the Company's compliance with the DPA.

46. Under the DPA, the Company is obligated, among other things, to take certain steps to improve internal controls and to reorganize its Finance Department. If the Company has not substantially implemented these and other required reforms for a period of at least two successive quarters before September 30, 2006, the USAO and the SEC may, in their discretion, extend the term of the Independent Examiner.

47. In his Fourth Report dated June 15, 2006, the Independent Examiner expressed the view that, in light of the internal control issues recently disclosed regarding the expensing of options and other restatements of reported financial results, described in Item 9A of the Company's Annual Report on Form 10-K for its fiscal year ended March 31, 2006, including the fact that the Company has not yet hired a new chief financial officer, he is no longer able to conclude that the Company will be able to meet its obligation under the DPA to have improved internal controls and reorganized the Finance Department for two successive quarters prior to September 30, 2006. The term of the Independent Examiner may be extended beyond September 30, 2006.

48. However, the Company is subject to prosecution at any time if the USAO determines that the Company has deliberately given materially false, incomplete or misleading information pursuant to the DPA, has committed any federal crime after the date of the DPA or has knowingly, intentionally and materially violated any provision of the DPA (including any of

13

those described above). Also, as indicated above, the USAO and SEC may require that the term of the DPA be extended beyond 18 months.

49. CA's compliance with the DPA as a responsibility of the members of the CA board sitting at the time the DPA was in effect. Those directors include defendants D'Amato, Fernandes, LaBlanc, Lofgren, Lorsch, McCracken, Ranieri, Schuetze, Swainson, Unger Zambonini and Cron (the "DPA Defendants").

50. As described below, while the DPA was in effect, the DPA Defendants failed to formulate, implement and oversee adequate procedures for CA's compliance with the DPA.

### 1.    The Improper Award Of Stock Options And Improper Accounting Therefore Violated The DPA

51. In violation of the spirit, if not the letter of the DPA, the DPA Defendants caused and/or permitted CA to fail to properly account for the options compensation it awarded to employees from 1997 to 2001 as set forth hereinbefore.

### 2.    The Company's Failure To Maintain Adequate Internal Control And Failure To Properly Account For Expenses And Revenues Violated The DPA

52. The July 31, 2006 Form 8-K disclosed that the Form 10-K also contained (1) sales commission expense that should have been recorded in the fiscal quarter ended December 31, 2005; (2) subscription revenue as a result of the Company's review of license agreements. The subscription revenue in Fiscal Years 2004 and 2005 was increased by $12 million and $43 million, respectively; and (3) a restatement of financial results for the third quarter of fiscal year 2006 to reflect approximately $31 million of additional commission expense that should have been recorded in that period.

14

53. The July 31, 2006 press release further disclosed that the Company had "identified

several Sarbanes-Oxley 404 material weaknesses, including two material weaknesses in

connection with [the] restatements," and that "in light of the restatements included in the Form

10-K . . . CA's previously issued financial statements for its 2005 through 2002(?) fiscal years

and the quarterly reported included in the 2006 through 2002(?) fiscal years should not longer be

relied upon."

54. The Form 10-K further stated, as regards to the Company's material weakness in

internal control:

> Management has conducted its evaluation of the effectiveness of
> internal control over financial reporting as of March 31, 2006
> based on the framework in Internal Control – Integrated
> Framework issued by the Committee of Sponsoring Organization
> of the Treadway Commission (COSO). Management's assessment
> included an evaluation of the design of the Company's internal
> control over financial reporting and testing the effectiveness of the
> Company's internal control over financial reporting. During this
> evaluation, management identified material weaknesses in the
> Company's internal control over financial reporting, as described
> below. Management has concluded that as a result of these
> material weaknesses, as of March 31, 20006, the Company's
> internal control over financial reporting was not effective based
> upon the criteria in Internal Control – Integrated Framework issued
> by COSO.
>
> A material weakness is a control deficiency, or a combination of
> control deficiencies, that result in more than a remote likelihood
> that a material misstatement of the annual or interim financial
> statements will not be prevented or detected. Management has
> identified the following material weaknesses as of March 31, 2006:
>
>     (i)    The Company did not maintain an effective control
>               environment due to a lack of effective
>               communications policies and procedures.
>               Specifically, (a) there was a lack of coordination
>               and communication among certain of the
>               Company's senior executives with responsibility for

15

the sales and finance functions and within the sales and finance functions regarding potentially significant financial information; and (b) there were communications by certain senior executives that failed to set a proper tone, which could discourage escalation of information of possible importance in clarifying or resolving financial issues. These deficiencies resulted in more than a remote likelihood that a material misstatement of the annual or interim financial statements would not be prevented or detected and contributed to the material weaknesses in internal controls described in items (ii) and (iii) below.

(ii)     The Company's policies and procedures relating to controls over the accounting for sales commissions were not effective. Specifically, the Company did not effectively estimate, record and monitor its sales commissions and related accruals. The Company also did not reconcile its commission expense accrual to actual payments on a timely basis. These deficiencies resulted in a material error in the recognition of commission expense, which resulted in a restatement of the interim financial statements for the three and nine-month periods ended December 31, 2005.

(iii)    The Company's policies and procedures relating to the identification, analysis and documentation of non-routine tax matters were not effective. The Company's tax function also did not provide timely communication to management of its assumptions regarding certain non-routine tax matters. This deficiency resulted in a material error in the recognition of taxes associated with the Company's cash repatriation, which occurred in the fourth quarter of fiscal year 2006.

(iv)    The Company's policies and procedures relating to the accounting for and disclosure of stock-based compensation relating to stick options were not effective. Specifically, controls including monitoring controls, were not effective in ensuring the existence, completeness, valuation and

16

presentation of the Company's granting of stock options, which impacted the Company's determination of the fair value associated with these awards and recognition of stock-based compensation expense over the related vesting periods from fiscal year 2002 through fiscal year 2006. This deficiency resulted in material errors in the recognition of compensation expenses, additional paid-in capital, deferred taxes and related financial disclosures relating to such stock options, which contributed to a restatement of annual financial statements for fiscal years 2005 through 2002, and for interim financial statements for fiscal years 2006 and 2005.

(v)    The Company's policies and procedures were not effectively designed to identify, quantify and record the impact on subscription revenue when license agreements have been cancelled and renewed more than once prior top the expiration date of each successive license agreement. This deficiency resulted in material errors in the recognition of revenue, which contributed to a restatement of annual financial statements for fiscal years 2005 and 2004, and for interim financial statements for fiscal years 2006 and 2005.

Each of the aforementioned material weaknesses in internal control over financial reporting individually resulted in more than a remote likelihood that a material misstatement of the Company's interim or annual financial statements would have been prevented or detected.

55. In violation of the spirit, if not the letter of the DPA, the DPA Defendants caused and/or permitted CA to fail to maintain true and accurate books and records as required by the DPA and to maintain adequate internal controls as required by the DPA.

56. As a result of the foregoing CA has suffered damages in the form of incremental compensation expenses from awarding deep in the money stock options.

17

## DEMAND EXCUSED

57. Defendants D'Amato, Fernandes, LaBlanc, Lofgren, Lorsch, McCracken, Ranieri, Schuetze, Swainson, Unger, Zambonini and Cron are the current directors of CA. All of these defendants have been directors of CA while CA was operating under the DPA and therefore all of them are responsible for CA's failure to comply with the DPA. In addition, a majority of CA's current directors were members of CA's SOCC and CHRC and are responsible for the improperly granted and awarded stock options.

58. It would be futile to require plaintiffs to issue a demand to the current Director Defendants requesting them to take action against themselves and certain senior CA executives for their intentional or reckless conduct as alleged in this Complaint. Not only would this require defendants to investigate and bring claims against themselves for their own misconduct, but their actions to date prove conclusively that they will not take such action.

59. For example, the majority of CA's board has conflicts of interests or lacks independence, which precludes them from bringing this action. Defendants' interconnecting directorships and strong family and social relationships would be prejudiced and harmed if defendants would bring such an action against each other. As a result, the current Director Defendants have an inherent bias against bringing or vigorously prosecuting this action.

60. Demand is futile because a majority of the current Director Defendants cannot be presumed to exercise independent judgment in assessing the merits of a demand due to their personal and financial interest in the subject matter of the claims raised in this Complaint.

61. The wrongful acts at issue may constitute violations of law, removing them from the protection of the business judgment rule.

18

62. Because the wrongful acts alleged in this Complaint are presently at issue in the DPA, the current Director Defendants cannot be expected to reach a truly independent and objective decision about whether to commence and prosecute this action against themselves for the wrongful acts at issue. Such an independent investigation and prosecution would require the current Director Defendants to sue themselves, their fellow or current or former directors, and allies in the top ranks of CA.

63. To the extent that the Company presently maintains or previously maintained officers' and directors' liability insurance coverage, that insurance would be the primary or principal source of any recovery against the defendants and would be rendered void if the Company commenced proceedings against the current Director Defendants, as these policies uniformly contain provisions which void coverage if the Company brings suit in its own name.

64. The current Director Defendants receive payments, benefits and other emoluments by virtue of their membership on the board and their control of the Company. They have thus benefited from the wrongdoing alleged herein and have engaged in such conduct to preserve their positions of control and the perquisites thereof, and are incapable of exercising independent objective judgment in deciding whether to bring this action.

65. As specified in detail in this Complaint, despite their specific knowledge or improper failure to obtain knowledge regarding CA's illegal practices, the current Director Defendants intentionally or recklessly failed to inform themselves of the improper accounting practices occurring at CA.

66. The current Director Defendants' decisions could not have been the product of an informed business judgment and were so facially egregious that they face a substantial likelihood

19

of liability based on the claims alleged herein, thus disabling them from being capable of making a disinterested, independent decision about whether to prosecute this action. Therefore, demand on the Board would have been futile.

67. At all relevant times, each current Director Defendant pursued a common course of conduct, acted in concert with, conspired with, and aided and abetted the other Director Defendants to accomplish the wrongs complained of herein.

## COUNT I

## FOR VIOLATIONS OF SECTION 14 OF THE EXCHANGE ACT

68. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69. Section 14(a) provides:

> It shall be unlawful for any persons by the use of the mails or by any means or instrumentality of interstate commerce or of any facility of a national securities exchange or otherwise in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors to solicit or to permit the use of his name to solicit any proxy or consent or authorization in respect of any security registered pursuant to Section 12 of this act.

70. Rule 14, promulgated under Section 14(a) prohibits the making of materially false and misleading statements in a proxy statement or other communication in connection with the solicitation of a shareholder vote.

71. During the relevant period, defendants issued a series of materially false and misleading statements in the Proxy Statements issued July 21, 1998, July 22, 1999, July 14, 2000, July 18, 2001, July 26, 2002, July 21, 2003, July 18, 2004, and July 19, 2005 (the "Proxies") in connection

20

with the solicitation of plaintiffs' vote in favor of the election of directors, and in the Proxy dated July 18, 2001, approval of a stock option plan.

72. In the 2001 Proxy, shareholders were solicited to vote on a proposal to approve and adopt the Computer Associates International, Inc. 2001 Stock Option Plan (the "Plan"). The Plan has intended to replace the 1991 Plan, which automatically terminated according to its terms on June 24, 2001. The Plan reserves for issuance Stock Option awards of 7,500,000 shares of Common Stock ("Shares") that is equivalent to the number of Shares that were previously available for grant under the 1991 Plan but which can no longer be awarded due to the automatic expiration of the 1991 Plan.

73. The 2001 Proxy represented to shareholders the Plan was approved by the Compensation Committee and adopted by the Company's Board of Directors, subject to the approval of shareholders. In the Proxy, CA's Board recommended approval of the Plan.

74. Each Proxy was used to solicit proxies for the shareholder votes.

75. None of the Proxies disclosed the fact that CA's directors were granting options which were not allocated to specific employees in violation of the terms of the Plans and which would eventually cost CA hundreds of millions of dollars in incremental compensation expense beyond that intended to be award by the CA SOCC.

76. Each Proxy was distributed by the mails and other means and instrumentalities of interstate commerce and was in violation of Section 14 and the rules promulgated thereunder.

77. The defendants sought and received approval from CA's shareholders via a false and misleading Proxy.

78. As a result of the foregoing, plaintiffs are entitled to injunctive and other relief.

21

## COUNT II

## BREACH OF FIDUCIARY DUTY
### (Against All The Director Defendants)

79. Plaintiffs repeat and reallege each and every allegation set forth above.

80. Each Director Defendant owed to the Company and its stockholders the duty to exercise due care and diligence in the management and administration of the affairs of Company and in the use and preservation of its property and assets.

81. By reason of their positions and because of their ability to control the business and corporate affairs of the Company, at all relevant times, the Director Defendants owed to the Company and to its stockholders, fiduciary obligations of loyalty, due care and candor, and were and are required to control the Company in a fair, just and equitable manner, and to act in furtherance of the best interests of the Company and its stockholders.

82. In addition, the Director Defendants owed to Computer Associates and its shareholders a duty to ensure that Computer Associates operated in compliance with all applicable federal and state laws, rules and regulations, that Computer Associates did not engage in any unsafe or unsound practices, and that Computer Associates did not waste its corporate assets.

83. To discharge these duties, the Director Defendants were required to exercise reasonable and prudent supervision over the management, policies, practices, controls and financial and corporate affairs of Computer Associates. By virtue of this obligation of ordinary care and diligence, the Director Defendants were required, among other things, to:

22

(a)      manage, conduct, supervise and direct the employees, businesses and affairs of Computer Associates in accordance with laws, rules and regulations, and the charter and by-laws of Computer Associates;

(b)      neither violate nor knowingly or recklessly permit any officer, director or employee of Computer Associates to violate applicable laws, rules and regulations and to exercise reasonable control and supervision over such officers and employees;

(c)      ensure the prudence and soundness of policies and practices undertaken or proposed to be undertaken by Computer Associates;

(d)      remain informed as to how Computer Associates was, in fact, operating, and upon receiving notice or information of unsafe, imprudent or unsound practices, to make reasonable investigation in connection therewith and to take steps to correct that condition or practice;

(e)      supervise the preparation, filing and/or dissemination of any SEC filing, press releases, audits, reports or other information disseminated by Computer Associates and to examine and evaluate any reports of examinations or investigations concerning the practices, products or conduct of officers or employees of Computer Associates;

(f)      exercise reasonable control and supervision over the officers and employees of Computer Associates;

(g)      maintain and implement an adequate system of internal controls at Computer Associates, including financial, accounting and management information systems;

(h)      supervise the preparation and filing of any audits, reports, or other information disseminated by Computer Associates, to examine and evaluate any reports of

23

examinations, audits, or other information concerning the financial state of Computer Associates, and to make full and accurate disclosure of all material facts concerning, inter alia, each of the subjects and duties set forth above; and

(i)     preserve and enhance Computer Associate's reputation as benefits a global public corporation and to maintain public trust and confidence in Computer Associates as a prudently managed institution fully capable of meeting its duties and obligations.

84. The Director Defendants' conduct set forth herein was not due to an honest error or misjudgment, but rather was due to their intentional breach or reckless disregard of their fiduciary duties to the Company. The Director Defendants intentionally breached or recklessly disregarded their fiduciary duties to protect the rights and interests of Computer Associates and its shareholders.

85. The Director Defendants intentionally or recklessly breached their fiduciary duties by, among other things:

(a)     Allowing granted stock options to be accumulated in pools rather than allocating granted options to individual employees at the time of grant;

(b)     Allowing deep-in-the-money stock options to be awarded to employees in violation of the Plans;

(c)     Failing to ensure that CA complied with the DPA;

(d)     Failing to have in place sufficient controls and procedure to monitor CA's accounting practices and compliance with the DPA; and

(e)     Knowingly or recklessly disseminating and permitting to be disseminated, misleading proxy statement to shareholders, the investing public, and the public at large.

24

86. Defendants' grant of options as described herein also constitutes a waste of CA assets.

87. The Current Director Defendants are guilty of at least inaction amounting to recklessness in failing to ensure CA complied with the DPA, rendering them personally liable to the Company for breaching their fiduciary duties. As a result, Computer Associates has been substantially damaged.

88. Computer Associates and its stockholders have sustained and will continue to sustain injury and damages by reason of the Director Defendants' intentional breach or reckless disregard of their fiduciary duties to the Company and its shareholders.

## DEMAND FOR A JURY TRIAL

89. Plaintiffs demand a trial by jury pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all claims so triable.

WHEREFORE, plaintiffs demand judgment, in favor of Computer Associates, as appropriate, against defendants as follows:

A.     Declaring that defendants have violated and/or aided and abetted the breach of fiduciary and professional duties to the Company and its shareholders;

B.     Awarding the Company compensatory damages against defendants in an amount to be determined at trial, together with pre-judgment and post-judgment interest at the maximum rate allowable by law;

C.     Rescinding all awards of options in contravention of terms of the Plans;

C.     Awarding the Company punitive damages against defendants;

D.     Awarding plaintiffs the costs and disbursements of this action, including reasonable allowances for plaintiffs' attorneys' and experts' fees and expenses; and

25

E.     Granting such other or further relief as may be just and proper under the

circumstances.

Dated: September 14, 2006

SQUITIERI & FEARON, LLP

By:_____

Lee Squitieri (LS-1684)
Stephen J. Fearon, Jr. (SF-8119)
32 East 57th Street
12th Floor
New York, New York 10022
(212) 421-6492

WECHSLER HARWOOD LLP

By:_____

Robert I. Harwood (RH-3286)
Samuel K. Rosen (SR-3287)
488 Madison Avenue
New York, New York 10022
(212) 935-7400

26

## VERIFICATION

I, Bert Vladimir, declare under penalty of perjury says:

I am the plaintiff in the within action. I have read the Complaint and know the contents thereof; the same is true to my own knowledge, except as to the matters therein stated to be alleged on information and belief, and as to those matters I believe them to be true. I am and have been, a shareholder of the defendant CA,Inc. for the entire period in question in this suit.

_____
Bert Vladimir